ANITA ALBERTS ASSOCIATES
By: Anita F. Alberts Esquire
Attorney ID # 28086
The Atrium, Suite 2 West
301 South Main Street
Doylestown PA 18901
(215)340-0700

---

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DOLORES (DEE) BARRETT** | : | |
| | : | |
| **V.** | : | **CIVIL ACTION - LAW** |
| | : | |
| **THE GREATER HATBORO CHAMBER** | | **NO. 02 -cv-4421** |
| **OF COMMERCE, INC.; JOHN J.(BUD)** | : | |
| **AIKEN, AND MICKEY GLANTZ** | : | **JURY TRIAL DEMANDED** |
| | | |
| | : | |

### COMPLAINT

### Jurisdiction

Jurisdiction is premised upon diversity of citizenship, 28 U.S.C. §1332. Plaintiff is a resident of New Jersey. All individual defendants reside in Pennsylvania and Corporate Defendant is a Pennsylvania company and has offices in Pennsylvania. This action states claims under Article I § 28 of the Pennsylvania Constitution prohibiting denial or abridgment of equality of rights because of sex; for sexual harassment, discrimination and wrongful discharge from employment in violation of public policy as expressed in the Pennsylvania Human Relations Act, 43 P.S. § 951 et. seq., and under the common law.

### Parties

1. Plaintiff is Dolores (Dee) Barrett, an adult individual, *sui juris,* residing at 103 Beach Avenue, Pierces Point, Cape May Courthouse NJ 08210. From May 1990 to October 2000 she lived in Hatboro PA and was Executive Director of The Greater Hatboro Chamber of Commerce.

2.  Defendant The Greater Hatboro Chamber of Commerce is a registered Nonprofit Pennsylvania corporation with offices at 120 South York Road Suite 2, Hatboro PA 19040.

3.  Defendant John J. (Bud) Aiken is an adult individual, *sui juris,* residing at 21 Orchard Avenue, Hatboro PA.  At times relevant to this action Mr. Aiken was a member of the Board of Directors of Defendant Chamber, President and Vice President of the Board, and since December 2000, Chief Operating Officer of said corporation.

4.  Defendant Mickey Glantz is an adult individual, *sui juris,* owning operating and maintaining a business at Hatboro Collision, 224 S. York Road, Hatboro PA   At relevant times to this action he was a member of the Chamber Board of Directors, and was President of the Chamber Board of Directors from 1995 to 1999.

### Factual Statement

5.  During the ten years Plaintiff worked for the Chamber she built its membership, achieving a threefold increase by vigorous marketing of the Chamber.  She ran all Chamber affairs, organized community events, and performed her duties in exemplary fashion.

6.  At time of Plaintiff's hire Bud Aiken was Vice President of the Chamber Board and also Plaintiff's supervisor.  He required Plaintiff to accompany him on his visits to Chamber members on a weekly basis. During such visits Aiken often touched Plaintiff's thigh when they were sitting down, and complimented her appearance and performance.   Initially, Plaintiff thought this conduct was manifestation of friendship in their business relationship.

7.  Around Christmas 1991, Aiken unexpectedly and inappropriately kissed Plaintiff on the lips in the chamber office during work hours.  Plaintiff was shocked.  Aiken claimed he was merely wishing her a merry Christmas.

8.  In 1992, Aiken became President of the Chamber Board of Directors.  He assisted Plaintiff with bookkeeping tasks because the Chamber did not employ a bookkeeper.

9.  In 1993, Aiken, as Past President of the Chamber, worked more frequently with Plaintiff, in computerizing accounting records.  He began inappropriately touching Plaintiff, who objected, told him to stop, and pulled away. But Aiken just laughed, belittling her.

10.  In 1994, Aiken escalated his inappropriate contacts with Plaintiff, putting his fingers down her blouse if she bent over, making remarks such as "Nice, nice. . ."  Again, each time Plaintiff told him to get away from her.  He ignored her objections.

11.  In 1995, Plaintiff attempted to formally discuss Aiken's harassing behavior with him. Aiken pretended not to know what she was talking about.  About two weeks later Aiken came to the office and suddenly tried to put his fingers down the front of her blouse.  Shocked, she pulled away quickly, and fell.  Aiken apologized for "kidding around."  Plaintiff told him again, "Bud, you have got to stop this.  I don't want you to put your hands down my blouse.  Don't do that.  I don't want you to do that.  Do you understand what I'm saying?"  Aiken said he was "just a friendly guy" who "liked to kid around." Plaintiff's knee was sore for about two weeks.

12.   After this incident Aiken temporarily stopped touching Plaintiff and was very polite to her, for several months.

13.  In 1996, Aiken began touching Plaintiff again. She strongly objected. Aiken told Plaintiff his wife would not have sex with him. Plaintiff told Aiken to see a marriage counselor.

14. In 1995, Mickey Glantz became Board President. Glantz continually harassed Plaintiff, on the basis of her sex and her Italian heritage, calling her "Wop." Glantz routinely asked Plaintiff whether she'd had sex the night before, and told her, "I know how you Italians are.  I know you give good head."  He called Plaintiff  "Italian bitch," and compared her to his

wife, who was Italian.  If Plaintiff answered the phone pleasantly when he called the Chamber office, Glantz would offensively ask whether her husband "gave her some" to make her happy.

15.   When Plaintiff attempted to talk to Glantz about his conduct, he always erupted into an abusive shouting tirade.  He threatened to fire her and hire "a dumb blond with big boobs who won't mind the way I talk to her."  Glantz,  like Aiken, claimed his misconduct was "joking".

16.  In March 1998 Plaintiff wrote a formal complaint to Glantz about his verbal abuse, because he shouted at her if she tried to discuss it with him and threatened to fire her.

17.   After Plaintiff's March 1998 written complaint Glantz became more abusive.  When Plaintiff came to his place of business to have him sign checks to pay Chamber bills. They were outside, on a public street. Glantz signed the checks. Plaintiff left. Glantz called her back. Glantz said, "You have a big ass. Do you take it up the ass?"  Plaintiff, upset, called him a pig and left.

18.   Aiken frequently heard Glantz making offensive sexual remarks to Plaintiff. Feigning friendship and concern, he urged Plaintiff to "go to the Board of Directors" about Glantz.  Plaintiff  told Aiken, "You are the Board of Directors.  I'm telling you about this. Do something."  Aiken never did.

19.   Glantz became even more offensive.  In fall 1999 Plaintiff told him she did not appreciate the way he talked to her.  Glantz replied, "I will talk to you, to my wife, and to my secretary any way I want."  Plaintiff threatened to go to the Board of Directors if Glantz did not stop.  Glantz taunted her, "Go ahead, see who they believe, you or me."

20.   In November 1999, after the Chamber Christmas parade, Aiken offered to help Plaintiff put signs, posters, and parade paraphernalia away.  Plaintiff knelt on the floor to move things around in the office closet.  She turned around, on her knees, expecting Aiken to hand her something to be put away.  Instead, Aiken stood before her with his fly unzipped and his erect

4

penis exposed, massaging himself.  He said, "You want some of this?"  Plaintiff hit him above the knees, pushing him away and shouting, "Get the _____ out of here! I'm sick of this! Get out!  I'm going to tell your wife and Jim about this!"  Aiken stopped coming to her office.

21.  In late December 1999 or early January 2000, Plaintiff took checks to Glantz's place of business for signing.  Noticing Plaintiff's new car, Glantz said, "Oh, what did you do to get that?  Get down on your knees and give Jim (Plaintiff's husband) a blow job?"  Glantz continued to threaten Plaintiff's job and make offensive sexual remarks during 2000, after his term as Board President had ended.

22.  In October 2000, the Board advised Plaintiff she had "grown the Chamber" so well that her job was "too big for one person," and demoted her.  She learned Aiken was to take over her administrative duties. Plaintiff was offered a job as "chief marketing director," for half the salary, or $15,000 a year.   Plaintiff refused to sign a voluntary separation agreement. The alternative was discharge.

23.  Plaintiff did not accept the demotion "job" at half pay.  Defendant Chamber never created or filled the fictitious position of "chief marketing director."  Aiken, Plaintiff's harasser, currently holds Plaintiff's job and occupies Plaintiff's former office, with the new title of "chief operating officer" rather than the "executive director" title she held.

24. Plaintiff's replacement by Aiken was done in retaliation for Plaintiff's refusal to accept Aiken's sexual advances and endure sexual harassment from both Aiken and Glantz, and to cover up the Board's complicity in the harassment, discrimination and humiliation of Plaintiff.

25.  During Plaintiff's employment her compensation was significantly lower than other executive directors of area chambers of commerce. Plaintiff requested salary increases annually.

She had increased Chamber membership from 200 to nearly 700 members. But Plaintiff was told she did not need more money, or only a small raise,  because her husband made a good living.

26.  Plaintiff's earnings were thereby based upon her gender and marital status.

27.  Following Plaintiff's separation from employment, Chamber representatives maliciously told individuals in the community that the Chamber "got rid of" Plaintiff, i.e. that she was discharged from employment for cause.

28.  Publicity about Plaintiff's demotion appearing in local newspapers has hampered and prevented her from obtaining a similar position to the executive director job she held.

29.  In protest of Plaintiff's forced resignation and discharge from employment 24 volunteer Parade Marshals of the Greater Hatboro Chamber of Commerce resigned their unpaid positions, stating:

> "We the undersigned hereby tend [sic] our resignations as volunteer Parade Marshals of the Greater Hatboro Chamber of Commerce.  This action is in formal protest to the manner in which the Chamber secured the resignation of Dee Barrett as Executive Director of the Chamber.
>
> Dee was given the option of having her salary reduced in half or resigning her position.  This was done so the Chamber could give one of their "Good Old Boys," Bud Aiken, her position. Bud had recently sold his business and was bored.
>
> We also refuse to work for half our former salary, which was nothing,  and in our opinion "nothing" is what the residents of Hatboro expect from Bud.  We all volunteered because we believed in what Dee was doing for Hatboro, just as we are all resigning because of what was done to Dee."

30. Plaintiff became an involuntary object of derision in the community because of her publicized demotion and forced resignation.

31.  After Plaintiff's termination, the Chamber hired a secretary ("Barbara") whom Plaintiff, as  Executive Director, was required to discharge, at Aiken's insistence.  Plaintiff was told by Aiken repeatedly to fire her, stating "Barbara" was a "troublemaker" and "wants your job."  After Plaintiff was forced out by Aiken and the Chamber, Barbara was rehired, to assist Aiken.  Barbara told anyone who called the office to talk with Plaintiff that the Chamber "got rid of" Dee Barrett, implying Plaintiff was discharged for cause.

## COUNT I

## VIOLATION OF PLAINTIFF'S RIGHTS UNDER ARTICLE 1 § 28 OF THE PENNSYLVANIA CONSTITUTION

32.  Allegations contained in paragraphs 1 through 31 above are incorporated herein as if set forth in full.

33.  At all times relevant to this action Plaintiff possessed the same right to work in an atmosphere free from harassment, abuse, ridicule, ethnic slurs, threats and insults, as does a male citizen of the Commonwealth of Pennsylvania.  She also had the right to have her compensation based upon merit rather than the earning capacity of her spouse, and the right to be treated with courtesy and to maintain basic dignity and be treated with respect.

34.  Defendant Chamber, as Plaintiff's employer, had a duty to maintain terms and conditions of Plaintiff's employment in conformity to the laws and Constitutional provisions of the Commonwealth of Pennsylvania.   Article I §28 of the Pennsylvania Constitution is the State's Equal Rights Amendment and provides, **"Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual."** Plaintiff has a direct cause of action against all Defendants under this provision.

35.   At all times relevant to this action defendants Aiken and Glantz acted under color of their authority as officers and directors of the Greater Chamber of Chamber of Commerce, and used their ostensible power to belittle, humiliate, ridicule, control, and abuse Plaintiff, who at all times gave her best efforts to the Chamber and performed her duties in furtherance of Chamber's interests and success.

36.   In replacing Plaintiff with her chief harasser, Aiken, and in employing a secretary whom Plaintiff had discharged, Defendant Chamber deliberately retaliated against Plaintiff and acted to cover up the illegal misconduct and discrimination against Plaintiff which it had sanctioned for years.

37.  All of the illegal misconduct described herein violated Article I §28 of the Pennsylvania Constitution by depriving Plaintiff of equal treatment under the law and by ignoring her Constitutional right to be free from harassment, intimidation, wage discrimination, personal humiliation, physical and verbal abuse, based on her sex, female.

38.   As a direct and proximate result of the Defendants' violations of Plaintiff's Constitutionally protected rights Plaintiff has suffered extreme emotional distress and mental anguish, sleeplessness, nausea, shame, intimidation, fear, depression, embarrassment, public humiliation, loss of earnings and earning capacity, anxiety, loss of personal dignity, irreparable damage to her reputation in the community, loss of self confidence, and loss of self esteem, because she was consistently treated as less of a person because she is a woman.

39.  Plaintiff was demoted, discharged, and forced out of her job in willful and deliberate punishment for her refusal to allow Aiken sexual  favors and her refusal to continually endure the verbal, emotional and physical taunting, humiliation and abuse of Aiken and Glantz.  Defendant

Chamber then compounded its illegal misconduct by awarding Plaintiff's job to her principal harasser and abuser, Aiken.

WHEREFORE, Plaintiff demands judgment against all defendants in an amount in excess of $150,000.00 plus interest, counsel fees and costs of this action for violation of her rights as guaranteed by Article I § 28 of the Pennsylvania Constitution.

<b><u>COUNT II</u></b>

**<u>WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY AS EXPRESSED IN THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S.§ 951 ET. SEQ.</u>**

40.   Allegations contained in paragraphs 1 through 39 above are incorporated herein as if set forth in full.

41.   The Pennsylvania Human Relations Act was promulgated by the Pennsylvania Legislature in 1955 as a manifestation of the public policy of the Commonwealth " to foster the employment of all individuals in accordance with their fullest capacities regardless of their race, color, religious creed, ancestry, handicap or disability . . . [their] age, sex, or national origin,  and to safeguard their right to obtain and hold employment without such discrimination, to assure equal opportunities to all individuals and to safeguard their rights to public accommodation , , , regardless of race, color, sex, religious creed, ancestry, sex, handicap or disability . . .or national origin." (43 P. S. §952(b).

42. The PHRA does not directly apply to Defendant Chamber because the statutory definition of "employer" requires at least four employees.  Therefore the Pennsylvania Human Relation Commission has no jurisdiction over Plaintiff's claims of gender discrimination and harassment and Plaintiff need not exhaust administrative remedies.

9

43. Notwithstanding jurisdictional limitations of the PHRC, Defendant Chamber, as a Pennsylvania Corporation created and operating under the laws of Pennsylvania and its own bylaws, possesses a strict legal obligation to abide by the public policy of this Commonwealth, and in violation of public policy as manifested by the PHRA by wrongfully harassing, demoting and discharging Plaintiff on the basis of her gender, has violated important public policy.

44.   As a direct and proximate result of Defendants' misconduct, Plaintiff has suffered extreme emotional distress and mental anguish, sleeplessness, nausea, shame, intimidation, fear, depression, embarrassment, public humiliation, loss of earnings and earning capacity, anxiety, loss of personal dignity, irreparable damage to her reputation in the community, loss of self confidence, and loss of self esteem, because she was consistently treated as inferior because she is a woman, in violation of the public policy underlying the PHRA.

45.   Plaintiff was demoted and discharged in willful and deliberate punishment for her refusal to allow Aiken sexual  favors and to endure the verbal and physical taunting, humiliation and abuse of Aiken and Glantz.   Defendant Chamber then compounded its misconduct by awarding Plaintiff's job to Aiken, her principal harasser.

WHEREFORE, Plaintiff demands judgment against all defendants in an amount in excess of $150,000.00 compensatory damages plus interest, counsel fees and costs for wrongful discharge in violation of important public policy expressed by PHRA, 43 P.S. §951 et. seq.

## COUNT III

## PUNITIVE DAMAGES

46. Allegations contained in paragraphs 1 through 45 above are incorporated herein as if set forth in full.

47. Defendants' misconduct, including but not limited to Aiken's indecent exposure of his penis, which constitutes criminal behavior subject to prosecution, was outrageous and utterly intolerable in a civilized society, and justifies awarding punitive damages under Pennsylvania law.

48. Under Pennsylvania law, wrongful discharge in violation of public policy is a tort, and Pennsylvania law allows recovery of punitive damages in tort cases where appropriate, in addition to compensatory or nominal damages, to punish outrageous misconduct and to deteeer defendants and others like them from similar conduct in the future.

49. At all times relevant to this action, all defendants, corporate and individual, conducted themselves with evil motive and with reckless indifference and disregard to the rights of Plaintiff because of her gender and with malice, because of their power and control of the terms and conditions of her employment.

WHEREFORE, Plaintiff demands punitive damages in excess of $150,000 for outrageous misconduct done in reckless disregard for the rights of Plaintiff and with malicious motive, utterly intolerable in a civilized society, in addition to compensatory damages, lost wages, interest, counsel fees and costs of this action.

ANITA ALBERTS ASSOCIATES


_____
Anita F. Alberts Esq. ID # 28086
Counsel for Plaintiff Dee Barrett